**IN THE UNITED STATES DISTRICT COURT FOR THE
EASTERN DISTRICT OF OKLAHOMA**

COREY BURNS, an individual,        )
                                   )
                Plaintiff,         )
                                   )
v.                                 )    Case No. CIV-13-528-KEW
                                   )
DAL-ITALIA, LLC, a foreign         )
limited liability company,         )
d/b/a DAL-TILE,                    )
                                   )
                Defendant.         )

## OPINION AND ORDER

This matter comes before the Court on Defendant's Motion for
Summary Judgment (Docket Entry #70). Upon review and consideration
of the filings of the parties, this Court renders this ruling.

Plaintiff was diagnosed with epilepsy at the age of 19 and
experienced seizures as a part of his condition. Plaintiff
testified that he always has between thirty seconds and three
minutes of advance notice of the coming on of a seizure. The
advance notice consists of strange smells such as chocolate, the
ocean, pine trees, or a rose. He also gets dizzy before the onset
of a seizure. Plaintiff states these precursors always mean a
seizure is coming and he has never experienced a seizure without
first feeling it coming on. If the seizure is a petit mal,
Plaintiff does not require "very much recovery time."

Defendant hired Plaintiff in its plant located in Muskogee,
Oklahoma in May of 2006. The plant manufactures ceramic tile
products. At the time of his hiring, Plaintiff disclosed that he

suffered from seizures during his interview but told the interviewer he was on medication. Plaintiff was hired as a Press Operator at the Muskogee plant, working with machines that formed the tile pieces. Plaintiff had explained to the interviewer that he had been on Social Security disability for a time due to his seizures.

Plaintiff initially worked on the D shift, working Wednesday through Saturday from 6:00 p.m. until 6:00 a.m. He suffered his first petit mal seizure about one month into his employment with Defendant. Plaintiff felt the seizure coming on and sat on a stair near his station on the line. His supervisor saw that he was sitting down and asked if he was OK. Plaintiff told him he was having a seizure. The supervisor sat with Plaintiff for the minute and one half that the seizure lasted. Plaintiff asked if he could go home and his supervisor as well as Larry Kenworthy ("Kenworthy"), the D shift manager, allowed him to leave work. Kenworthy was aware Plaintiff had experienced a seizure, explaining he had a deceased step daughter who had epilepsy.

Plaintiff again suffered a "medium size" seizure at work about a month later. He sat down on the floor and was observed by other workers. Kenworthy came over and made sure Plaintiff was okay. Plaintiff did not go home but recovered in about ten minutes. In all, Plaintiff suffered three to four seizures while working as a press operator.

In August of 2007, Plaintiff requested a transfer to the glaze line within the facility because the pay was higher. His request was granted and his new lead was Justin Arnett ("Arnett"). Plaintiff testified that Arnett knew of his condition. During this time, Kenworthy also allowed Plaintiff to fill in for leads and told him the next time a lead job came up for bid that he should bid on it because his attendance, performance, and safety were good.

On July 10, 2009, Plaintiff was promoted to a lead. During this time, Plaintiff was experiencing approximately one or four seizures per month. These seizures were both petit and grand mal seizures. The longest period Plaintiff went without having a seizure was six months. Plaintiff was granted Family Medical Leave Act ("FMLA") leave for the recuperative time required after his seizures. The FMLA forms submitted by Plaintiff were signed by a Dr. Elgin, physician and/or Mr. Mutch, a physician's assistant. FMLA leave is administered at Defendant's facility by a third party, Benefits Service Center. Defendant's management and human resources department are not involved in the processing or eligibility determinations in granting or denying FMLA leave.

In November of 2011, Plaintiff eventually stepped down from his lead position due to his seizures. He became concerned that his condition was affecting his ability to focus to keep the tile quality up to par. In January of 2013, Plaintiff was restored to

his lead position about six months later when Plaintiff was transferred to B shift.

On February 11, 2013, Plaintiff experienced his first seizure since returning to his lead position on B shift. At about 8:00 p.m. or 9:00 p.m. at the end of the glaze line, Plaintiff began to feel dizzy. A "glaze runner" was coming up the line and noted Plaintiff was standing and getting dizzy. Plaintiff went down on one knee when the glaze runner asked if he was okay. The glaze runner called Jack Wilkes ("Wilkes"), one of the B shift supervisors, on a radio. Plaintiff began having a seizure. Wilkes called a "code orange" meaning a worker was down. Wilkes told the Jeannie Sutton ("Sutton"), the shift manager to call 911, which Plaintiff testified had never been done before when one of his seizures occurred. Sutton also called Joseph Fuller ("Fuller"), the Human Resources Manager for the facility, to inform him that Plaintiff had experienced a seizure on the line.

Plaintiff estimates that the seizure lasted about a minute and a half. He asked Sutton to call his wife and children. An ambulance arrived, Plaintiff explained his seizures to the ambulance personnel, walked to the gurney, and was transported by ambulance to the hospital. Plaintiff stated he was afraid if he did not go to the hospital that his work would hold his refusal of treatment against him. Plaintiff was released from the emergency room and went home.

On February 12, 2013, Plaintiff called to take FMLA intermittent leave from work to recover from the prior day's seizure. Fuller spoke to Sutton and Wilkes concerning the occasion of Plaintiff's seizure on February 11, 2013. Fuller stated that both Sutton and Wilkes expressed concern for Plaintiff's safety on the line. However, Wilkes testified in his deposition that he did not have safety concerns for Plaintiff to continue to work as a glaze line lead on B shift. He further testified that he had not reached any decision about what Plaintiff is capable of doing. He did testify as to certain limitations Plaintiff might have in the specific performance of the lead position.

Fuller stated he spoke to Kirk Meinershagen, the facility's safety manager, who expressed concern over Plaintiff's ability to safely work at the plant based upon his understanding of events. Fuller determined Plaintiff could not return to work without documentation from his doctor stating he could safely work at the plant.

On February 13, 2013, Plaintiff went to work to attend a plant wide meeting. He was pulled aside by Fuller and told he could not put Plaintiff back on the production floor and he did not have any other job in which to place Plaintiff. Fuller asked Plaintiff if he had a doctor's note and Plaintiff stated he did not. Plaintiff told Fuller he did not have a note because of his FMLA paperwork which contained notations clearing him for work from his physician

and physician's assistant. Fuller offered the paperwork for short-term disability to which Plaintiff stated his condition was not a short-term disability. Fuller stated he was filling out the paperwork for short-term disability and Plaintiff did not argue with him. Fuller told Plaintiff he was sending him home and Plaintiff left.

Plaintiff testified that Fuller did not give him benefits group information or tell him that he needed a doctor's documentation that he could work safely before allowing him to return to work. Plaintiff did inform Fuller that he had a doctor's appointment on February 15. Plaintiff interpreted Fuller's statements as a termination of his employment with Defendant. Fuller never told Plaintiff that he was fired. Plaintiff did not contact anyone associated with Defendant's human resources department or the plant manager after his conversation with Fuller.

Plaintiff's wife posted on social media that Defendant had fired Plaintiff. On March 1, 2013, Fuller contacted Plaintiff while Plaintiff was in his attorney's office and reiterated the need for a doctor's note to return to work. Plaintiff told Fuller he did not obtain a doctor's note because his FMLA submission covered it. Fuller also stated Plaintiff was not fired. Plaintiff ended the conversation.

Plaintiff was contacted by Robin Krueger ("Krueger"), Defendant's Human Resources Director in Dallas, Texas on March 22,

2013 and March 25, 2013. Krueger reiterated the need for the doctor's note and she provided him with a copy of his job description to present to his doctor by correspondence dated April 1, 2013. Plaintiff did not present the description to his medical professional and did not contact Defendant. On April 30, 2013, Krueger sent Plaintiff a letter informing him if he did not provide documentation from his doctor by May 10, 2013, he would be considered to have abandoned his job and voluntarily ended his employment. Defendant considered Plaintiff separated from his job on May 10, 2013 when it received no communication from Plaintiff.

Plaintiff initiated this action for violation of the Americans with Disabilities Act ("ADA") and for interference with and retaliation for exercising his rights under the FMLA. Defendant filed the subject Motion, contending Plaintiff cannot prevail on any of the asserted claims.

Under Rule 56(c) of the Federal Rules of Civil Procedure, summary judgment is appropriate, "if the pleadings, depositions, answers to interrogatories, and admissions on file, together with the affidavits, if any, show that, "there is no genuine issue as to any material fact and that the moving party is entitled to a judgment as a matter of law." The moving party bears the initial burden of showing that there is an absence of any issues of material fact. Celotex Corp. v. Catrett, 477 U.S. 317, 325, 106 S.Ct. 2548, 2553-54, 91 L.Ed.2d 265 (1986). A genuine issue of

material fact exists when "there is sufficient evidence favoring the non-moving party for a jury to return a verdict for that party." Anderson v. Liberty Lobby, Inc., 477 U.S. 242, 249, 106 S.Ct. 2505, 2510-11, 91 L.Ed.2d 202 (1986). In determining whether a genuine issue of a material fact exists, the evidence is to be taken in the light most favorable to the non-moving party. Adickes v. S.H. Kress & Co., 398 U.S. 144, 157, 90 S.Ct. 1598, 1608, 26 L.Ed.2d 142 (1970). Once the moving party has met its burden, the opposing party must come forward with specific evidence, not mere allegations or denials of the pleadings, which demonstrates that there is a genuine issue for trial. Posey v. Skyline Corp., 702 F.2d 102, 105 (7th Cir. 1983).

Defendant first asserts summary judgment is appropriate in this case on Plaintiff's ADA claim because Plaintiff cannot demonstrate that he suffered an adverse employment action. Generally, the ADA prohibits discrimination "against a qualified individual with a disability because of the disability of such individual in regard to job application procedures, the hiring, advancement, or discharge of employees, employee compensation, job training, and other terms, conditions, and privilege of employment." 42 U.S.C. § 12112(a). In order to prevail on his claim for violation of the ADA, Plaintiff bears the burden of proof to establish: (1) that he is a disabled person within the meaning of the ADA; (2) that he is qualified, that is, with or without

reasonable accommodation (which he must describe), he is able to perform the essential functions of the job; and (3) that Defendant discriminated against him because of his disability. Davidson v. America Online, Inc., 337 F.3d 1179, 1188 (10th Cir. 2003).

Defendant contends Plaintiff cannot demonstrate the third element of the claim since he voluntarily separated from his employment with Defendant by abandoning his job on May 10, 2013 rather than February 13, 2013 when Fuller required a doctor's note before allowing Plaintiff to return to work. An "adverse employment action" is "liberally defined" and "are not simply limited to monetary losses in the form of wages or benefits." Rather, courts "take a case-by-case approach, examining the unique factors relevant to the situation at hand." Hillig v. Rumsfeld, 381 F.3d 1028, 1031 (10th Cir. 2004)(citations and quotation marks omitted). The Tenth Circuit has maintained that "those acts that 'constitute[ ] a significant change in employment status, such as hiring, firing, failing to promote, reassignment with significantly different responsibilities, or a decision causing a significant change in benefits" represent adverse employment actions but it has "not held that the term 'adverse employment action' is limited to such acts." Id. at 1032-33).

Under the facts of this case, while this Court does not necessarily agree with Plaintiff that he was terminated on February 13, 2013, it is clear from both parties' version of the facts that

Plaintiff was not at liberty to return to his employment without fulfilling the condition of obtaining a physician's prior certification that he could return to work, as Defendant was unwilling or unable to return him to a different position within the plant. The satisfaction of the adverse employment action element does not require an employer to expressly state "you are fired" since actions less than termination represent an adverse action. Moreover, even if short-term disability income was available to Plaintiff - a fact which is in dispute - the evidence indicates Plaintiff would have suffered a significant reduction in salary under disability and he certainly could not return to his prior employment. As a result, this Court concludes Plaintiff suffered an adverse employment action under the facts of this case.

Alternatively, Defendant contends that it made a determination that Plaintiff was unable to safely return to his employment without further evaluation by a physician. Under the express terms of the ADA, an employer may decide not to accommodate disabled individuals if they pose a "direct threat to the health or safety" of themselves or others. 29 C.F.R. § 1630.15(b)(2). A "direct threat" involves "a significant risk of substantial harm to the health or safety of the [person] or others that cannot be eliminated or reduced by reasonable accommodation." 29 C.F.R. § 1630.2(r).

The ADA regulations further provide that

[t]he determination that an individual poses a 'direct threat' shall be based on an individualized assessment of the individual's present ability to safely perform the essential functions of the job. This assessment shall be based on a reasonable medical judgment that relies on the most current medical knowledge and/or on the best available objective evidence. In determining whether an individual would pose a direct threat, the factors to be considered include:

(1) The duration of the risk;

(2) The nature and severity of the potential harm;

(3) The likelihood that the potential harm will occur; and

(4) The imminence of the potential harm.

Id.

In evaluating these factors, "the fact-finder does not independently assess whether it believes that the employee posed a direct threat, but determine[s] [instead] whether the employer's decision was objectively reasonable." E.E.O.C. v. Beverage Distributors Co., LLC, 780 F.3d 1018, 1021 (10th Cir. 2015) quoting Jarvis v. Potter, 500 F.3d 1113, 1122 (10th Cir. 2007).

Plaintiff had suffered from the seizures which resulted in his preclusion from returning to work for twenty years. He worked for Defendant for seven years in various jobs with increasing responsibility and suffered seizures on the job throughout his employment. Nothing in the nature or severity of the seizure which occurred on February 11, 2013 should have altered Plaintiff's perceived ability to safely perform his work that he had performed

safely for seven years. Undoubtedly, some level of risk existed at all times during Plaintiff's employment but the evidence also indicates Plaintiff never suffered a seizure without warning and did not lose consciousness or awareness during the seizures. This fact distinguishes this case from that of <u>Mayes v. Whitlock Packaging Corp.</u>, Case No. CIV-09-278-JHP cited by Defendant where the employee's seizures were unpredictable and violent and posed a significant proven harm to other employees.

However, several factual issues exist which precludes summary judgment for Defendant under the required "direct threat" rubric including (1) whether Defendant was based upon a "reasonable medical judgment" considering the dearth of its own medical evidence. It must be remembered that the assertion of a "direct threat" constitutes an affirmative defense for which Defendant carries the burden of proof; (2) the objective reasonableness of the evidence of "the likelihood that the potential harm will occur" given that seven years of employment history failed to indicate harm arising from Plaintiff's condition; and (3) the "imminence of the potential harm" for the same reason. Issues of disputed material facts exists as to whether Defendant could have reasonably accommodated Plaintiff's condition by continuing to allow FMLA leave for recuperation and/or transferring him to a different position. Consequently, Defendant is not entitled to summary judgment on Plaintiff's ADA claim.

Defendant also seeks summary judgment on Plaintiff's FMLA interference and retaliation claims. In order to prevail on the interference claim, Plaintiff must show (1) that he was entitled to FMLA leave; (2) that some adverse action by Defendant interfered with his right to take FMLA leave; and (3) that Defendant's action was related to the exercise or attempted exercise of his FMLA rights. Campbell v. Gambro Healthcare, Inc., 478 F.3d 1282, 1287 (10th Cir. 2007). Defendant challenges whether Plaintiff can satisfy the second and third elements of the claim. Plaintiff was prevented from exercising his FMLA leave rights by not being permitted to return to work when his leave for recuperation ended. Id.

In accordance with the Tenth Circuit's pronouncement in Campbell, after Plaintiff satisfied the first two elements, Defendant

> bears the burden of proving that an employee, laid off during FMLA leave, would have been dismissed regardless of the employee's request for, or taking of, FMLA leave. Smith v. Diffee Ford-Lincoln-Mercury, Inc., 298 F.3d 955, 963 (10th Cir. 2002) (citing 29 C.F.R. § 825.216(a)(1)). However, we have held that 'an employee who requests FMLA leave would have no greater protection against his or her employment being terminated for reasons not related to his or her FMLA request than he or she did before submitting the request.' Gunnell v. Utah Valley State Coll., 152 F.3d 1253, 1262 (10th Cir. 1998).

Campbell, 478 F.3d at 1289.

Defendant has sufficiently shown that its prohibition for Plaintiff to return to work was not related to his exercise of FMLA

leave but rather its evaluation of a "direct threat" posed by Plaintiff's condition. While Defendant may have technically violated the noticing requirements required by the FMLA in requiring a fitness for duty certification, this requirement did not lead to an interference in Plaintiff's exercise of his rights under the FMLA.

Campbell also conveniently sets forth the requirements for an FMLA retaliation claim. In order to prevail, Plaintiff must show that: "(1) []he engaged in a protected activity; (2) [Defendant] took an action that a reasonable employee would have found materially adverse; and (3) there exists a causal connection between the protected activity and the adverse action." Campbell, 478 F.3d at 1287 quoting Metzler v. Fed. Home Loan Bank of Topeka, 464 F.3d 1164, 1171 (10th Cir. 2006). The Tenth Circuit "characterized the showing required to satisfy the third prong under a retaliation theory to be a showing of bad intent or 'retaliatory motive' on the part of the employer." Metzler, 464 F.3d at 1171 (quotation omitted).

The record is devoid of any evidence of retaliatory motive on Defendant's part based upon Plaintiff's exercise of his FMLA rights. To the contrary, it appears Defendant was motivated exclusively by Plaintiff's condition and job performance. As a result, Defendant is entitled to summary judgment on all FMLA claims asserted by Plaintiff in this action.

IT IS THEREFORE ORDERED that Defendant's Motion for Summary Judgment (Docket Entry #70) is hereby **GRANTED** on Plaintiff's claims based in the Family Medical Leave Act. These claims are hereby **DISMISSED**. Summary judgment, however, is **DENIED** on Plaintiff's claim based upon a violation of the Americans with Disabilities Act due to the presence of a dispute in the material facts of the claim.

IT IS FURTHER ORDERED that the parties are permitted until **JANUARY 26, 2016** by which to submit a proposed, agreed pretrial order in this case which reflects the ruling herein.

IT IS SO ORDERED this 22nd day of January, 2016.

_____
KIMBERLY E. WEST
UNITED STATES MAGISTRATE JUDGE